IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN G. YATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 10-708-WDS-CJP |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff John G. Yates seeks judicial review of the final agency decision finding that he is not disabled and denying him Disability Insurance Benefits (DIB) and Supplemental Security Insurance (SSI) benefits pursuant to **42 U.S.C. § 423**.

### Procedural History

Mr. Yates applied for DIB and SSI in May, 2006, alleging disability beginning on December 31, 2004.[1]  After his application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Sally C. Reason.  ALJ Reason denied the application for benefits in a decision dated August 21, 2009.  (Tr. 17-32).  Plaintiff's request

---

[1]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

for review was denied by the Appeals Council, and the August 21, 2009, decision became the final agency decision. (Tr. 1-5).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this Court.

### Issues Raised by Plaintiff

Mr. Yates filed a brief, which he titled "Motion for Summary Reversal," at **Doc. 20**. The brief is singularly lacking in citations to the record, and presents the following points in cursory fashion:

1. The ALJ did not "seriously explain" why plaintiff did not meet Listing 4.05, Recurrent arrhythmias, and did not consider whether plaintiff met Listing 1.02, Major dysfunction of a joint, or Listing 1.04, Disorders of the Spine.

2. The ALJ erred in not accepting the opinion of his treating source, Dr. Rivera, and in discounting the opinion of examining physician, Dr. Choisser. She also erred in accepting the opinion of the state agency physician, Dr. Bancks.

3. The ALJ "clearly misrepresents" the evidence regarding plaintiff's cardiac condition.

4. The ALJ understated the severity of plaintiff's psychiatric condition.

5. The ALJ failed to address plaintiff's "chronic pain."

6. The ALJ did not consider the "sheer amount of doctor visits and hospitalizations."

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1. Plaintiff's Testimony**

The hearing took place on May 18, 2009. Plaintiff was represented by counsel at the hearing. (Tr. 47).

Mr. Yates was 45 years old at the time of the hearing. When asked how much education he had, he replied that he tested on a 5th grade level. (Tr. 53)

Plaintiff testified that he had worked in construction all his life. He had back problems and arthritis in his shoulder. He had fusion surgery on his neck in June of 2007. He still had problems and said he did not know if the fusion was completely healed. (Tr. 54). However, an MRI dated March 6, 2008, indicated that the fusion had healed properly. (Tr. 54-55).

After the surgery, plaintiff still had problems with his neck. He also had pain in his low back, radiating into his left leg. (Tr. 56). His worst problem is his back. He has been treated by a pain management clinic. He has had injections and takes Lyrica. He was supposed to see a neurosurgeon. (Tr. 57).

Mr. Yates testified that he also has atrial fibrillation, and "they're going to do surgery." (Tr. 58). He also has stomach problems. He began seeing signs of bleeding ulcers 10 years earlier. He has burning discomfort and vomiting every day. (Tr. 62).

According to Mr. Yates, he does almost nothing. (Tr. 60-61).

Plaintiff's attorney asked him why he has so many visits to different emergency rooms. Mr. Yates responded that, if he calls Pain Management and "told them of anything different or any complications they told me to go in to the emergency room." (Tr. 62-63).

In addition to his physical problems, plaintiff is depressed. (Tr. 65-66).

**2.   Mrs. Yates' Testimony**

Plaintiff's wife testified that Mr. Yates is depressed and extremely paranoid. He hears things, like voices in his head, and sees things that are not there. (Tr. 67-68).

**3.   Vocational Expert**

Gregory Jones testified as a vocational expert. (Tr. 69).

The VE was asked to assume a person with plaintiff's educational and work history who

could do light work, but was limited to only occasional postural activities, no ladders, avoid exposure to hazards such as machinery and heights, and no repetitive reaching over the shoulder with the left arm. (Tr. 70-71). The VE testified that this RFC would preclude plaintiff's past work. However, he could do other jobs such as housekeeeping cleaner and general cashier, both of which exist in significant numbers in the regional and national economy. (Tr. 71).

**4.**     **Medical Records**

Mr. Yates was diagnosed with paroxysmal atrial fibrillation in 2004, before the alleged onset of disability. He had a negative stress test and normal echocardiogram. He was treated with medication. (Tr. 188-197).

On October 9, 2004, an MRI of the left shoulder showed significant osteoarthritis but no tendinitis or rotator cuff tear. (Tr. 227, 246). A doctor in Jacksonville, Florida, administered cervical epidural steroid injections in 2004. He also injected the left shoulder bursa. Plaintiff reported good pain relief. (Tr. 198-207).

On November 9, 2005, an MRI of the cervical spine showed spurring and/or disc bulge at C5-C6 and spurring and/or disc protrusion at C6-C7. (Tr. 241).

Plaintiff was seen for neck and shoulder pain at Northeast Florida Primary Care in 2005 and 2006. (Tr. 250-332). He was treated with medication. On March 7, 2006, it was noted that he had no insurance and the medications were expensive. He had anxiety and stress "over everything." (Tr. 267).

In 2007, plaintiff was seen at the University of Mississippi Medical Center for his left shoulder and neck. (Tr. 362-375). On February 26, 2007, he came to the emergency room complaining of severe pain in his neck and left shoulder which was long-standing and was not getting better. He had had multiple evaluations in Florida and had been treated at a pain clinic there with methadone. He had been evaluated by a primary care clinic in Mississippi and the

paperwork was done for a referral to a neurosurgeon, but he never heard anything about it. (Tr. 371). He was given pain medication and Valium and was discharged. He was to be scheduled for an MRI and was to follow-up thereafter for a possible referral to a neurosurgeon or a pain clinic. (Tr. 372). An MRI of the cervical spine was done on April 2, 2007. It showed multilevel degenerative changes and stenosis at C5-C6 and C6-C7. (Tr. 368).

Cervical fusion surgery was done in June, 2007. (Tr. 507).

In September, 2007, plaintiff began treatment at the Pain Management Center of Marion, Illinois. On the first visit, he was evaluated by Dr. Jose Rivera. Dr. Rivera did a functional assessment on the first visit which was stated to be based on the patient's "perceived functions." According to this assessment, Mr. Yates could sit for less than 30 minutes, stand for less than 10 minutes, walk for less than 30 minutes, and lift less than 20 pounds. (Tr. 716).

Plaintiff received a series of epidural steroid injections at the Pain Management Center from November 5, 2007, through February 16, 2009. He generally reported that he experienced more than 50% pain relief, and that the pain relief lasted for a month to a month and a half. (Tr. 722-732).

Plaintiff was also seen numerous times at three emergency rooms in 2007 and 2008. He went to the emergency room at Herrin Hospital several times in 2007 complaining of neck pain. (Tr. 500, 507). On August 22, 2007, an x-ray of the cervical spine showed stabilization hardware in place, with otherwise unremarkable findings. (Tr. 506). Cervical MRI on October 3, 2007, showed that the fusion was stable and he had mild multi-level stenosis but no cord compression. A left shoulder x-ray was normal. (Tr. 492). On November 3, 2007, Mr. Yates went to the emergency room for low back pain. (Tr. 482-486). One month later, x-ray of the lumbar spine showed degenerative disc disease, most pronounced at L5-S1. (Tr. 481).

Mr. Yates also went to the emergency room at Memorial Hospital of Carbondale several

times in 2007 for complaints of back and neck pain. (Tr. 625- 638). X-rays of the cervical spine on August 27, 2007, again showed that the fusion was in place with no other remarkable findings. (Tr. 633). On October 5, 2007, he complained of low back pain. (Tr. 628). He returned on October 11, 2007, stating that he was out of pain medication and needed pain control. He said that Oxycodone worked better than other medications. (Tr. 609). On November 2, 2007, after having been seen earlier that date at Herrin Hospital, he went to the emergency room at Memorial Hospital of Carbondale, complaining that he was unable to control his pain. (Tr. 596). He had been given morphine at Herrin. He was given more pain medications at Memorial and discharged. (Tr. 599). On November 26, 2007, he went to the emergency room at Memorial for low back pain.. He said that he had been given an epidural shot on November 4, 2007, but his back was getting worse. He was given medication and released. (Tr. 592). On April 6, 2008, he told the emergency room staff that he had severe back pain. He said that he was on several medications, but denied having a doctor. (Tr. 582). He was given prescriptions for Medrol, Vicodin and Norflex.

On June 4, 2008, plaintiff again came to Memorial complaining of pain in his left ribs and shoulder. He was given a prescription for Vicodin. Later that day, the pharmacy called Memorial Hospital and said that Mr. Yates had filled a prescription for Vicodin on May 20, 2008. The doctor's note of the phone call states that Mr. Yates had not told the emergency room staff that he already had a prescription for Vicodin. The doctor asked the pharmacy to cancel the prescription. (Tr. 567).

Mr. Yates went the emergency room at Herrin Hospital on February 13, 2008, complaining of palpitations and shortness of breath after shoveling snow and drinking 2 beers. (Tr. 454).

During this same time period, plaintiff was also seen in the emergency room at Heartland

Regional Medical Center in Marion, Illinois. On August 30, 2007, he presented with generalized abdominal pain which had come on suddenly. He said that he was "currently off any pain meds." The review of systems was negative for back or neck pain. (Tr. 683). On physical exam, his neck was supple with no bony tenderness. He had normal joint range of motion. He was given IV saline and was improved. The impression was a GI bleed. (Tr. 684).

On February 5, 2008, he went to the emergency room at Heartland Regional complaining of back pain. (Tr. 702).

Plaintiff was treated at a Community Health and Emergency Services clinic. On February 9, 2009, he reported that his functional status was much better and he was able to work in his yard. He was less anxious and less depressed. (Tr. 521).

Plaintiff was evaluated by Dr. Son Phong Le regarding his atrial fibrillation on November 3, 2008. Mr. Yates gave a history of recurrent fibrillation for the past 6 years. He had been seen at different hospitals for this. He had 3 normal stress tests. Dr. Le noted that he was 70 inches tall and weighed 243 pounds. He smoked a pack and a half of cigarettes a day. He had hypertension, which was being treated. Dr. Le discussed treatment options of medications versus consideration of radiofrequency ablation. [2] Mr. Yates preferred radiofrequency ablation, so Dr. Le planned to refer him to Dr. Issa for evaluation. (Tr. 642-645). Mr. Yates returned to Dr. Le for reevaluation on February 18, 2009. He had not been to see Dr. Issa. Dr. Le did an EKG, which was normal. He was advised to continue taking Lortab to control his heart rate, and to see Dr. Issa. (Tr. 646-649). Mr. Yates was seen by Dr. Issa on April 24, 2009. Dr. Issa

---

[2]In a radiofrequency ablation procedure, "thin and flexible tubes are introduced through a blood vessel and directed to the heart muscle. Then a burst of radiofrequency energy is delivered to destroy tissue that triggers abnormal electrical signals or to block abnormal electrical pathways." http://www.americanheart.org/presenter.jhtml?identifier=4451, accessed on June 21, 2011.

noted that Mr. Yates gave a history of episodes of atrial fibrillation over the past 6 years, but there were no tracings to confirm this, and he had recently had a normal EKG test. Dr. Issa recommended that a 30-day event monitor be used to confirm whether he had atrial fibrillation. If atrial fibrillation were confirmed, he recommended a trial of medication first. Dr. Issa noted that, if an ablation procedure were recommended in the future, he would require Coumadin therapy for at least 4 months. Mr. Yates was to return to Dr. Issa in 3 months. (Tr. 651-654). There are no further records from this doctor.

Mr. Yates received mental health treatment from Southern Illinois Psychiatry, LLC, in 2008 and 2009. (Tr. 656-680). He was treated with medications, including Geodon, Lamictal, Xanax and Paxil. The records are somewhat difficult to read. The Axis I diagnosis appears to be major depressive disorder with psychosis. His thought processes were consistently noted to be normal and his thought content was unremarkable. He was consistently noted to have normal perception, but with some paranoia. He had no suicidal or homicidal thoughts. On one visit, July 1, 2008, his GAF was assessed at 50. (Tr. 668). On all other visits it was assessed at 60, except for one visit on which it was 65. (Tr. 678).

**5.     Consultative Physical Exam**

On September 14, 2006, Dr. William Choisser performed a consultative physical examination. (Tr. 333-337). This was, of course, prior to his cervical fusion surgery. Mr. Yates gave a history of heart problems, hypertension, 2 herniated discs in the cervical spine, arthritis and depression. Dr. Choisser noted that he would have to be evaluated by someone else for depression, but remarked that he was "sure" that his depression was a complication from intractable neck pain. Examination showed limited range of motion of the neck and left shoulder, along with loss of muscle tone of the left arm. His heart rate was regular. He had normal range of motion of the lumbar spine. The impression was cervical spine disease with

intractable pain and muscle spasm, hematuria and atrial fibrillation.

### 6. RFC Evaluations

On September 20, 2006, state agency physician Nicolas Bancks, M.D., evaluated plaintiff's RFC, and concluded that he could do a limited range of light work activities, i.e., he could frequently lift 10 pounds, occasionally lift 20 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours; however, his push/pull ability was limited in the left arm. In making this assessment, the doctor cited his history of osteoarthritis in the left shoulder and herniated disc at C6-C7. He also noted his history of atrial fibrillation, but noted he had no chest pain or shortness of breath. Dr. Bancks also stated that, even if the consultative examination were taken at "face value, the above RFC is objectively feasible." (Tr. 339).

In addition, Dr. Bancks assessed postural limitations in that plaintiff could only occasionally climb ladders, ropes or scaffolds, balance, crouch or crawl. His fine manipulation, gross manipulation and ability to reach were all limited. He had no visual, communicative or environmental limitations, except he should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 340-345).

### 7. Mental Assessment

On October 7, 2006, a doctor from Northeast Florida Primary Care completed a Treating Source Mental Health Report indicating that plaintiff was slightly depressed, but it did not interfere with his thought processes. He had no psychosis. His concentration was normal. His prognosis was good. (Tr. 360-361).

A Psychiatric Review Technique form was completed by Val Bee, Psy.D., in October, 2006. (Tr. 346-359). Dr. Bee concluded that plaintiff did not have a severe mental impairment. Dr. Bee noted that Mr. Yates did have a medically determinable impairment of major depression, but concluded that it was not severe. She assessed only mild limitations of his activities of daily

living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. Dr. Bee relied, in part, on the treating source report referenced above.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and he is not capable of performing his past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Yates is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The ALJ's Decision

Here, ALJ Reason properly followed the five step analysis. She concluded that plaintiff has the following severe impairments: degenerative disc disease status post cervical fusion, degenerative disc disease of the lumbar spine, osteoarthritis of the left shoulder, paroxysmal atrial fibrillation and hypertension. (Tr. 19). She found that these impairments do not meet or equal a listed impairment. With regard to mental impairments, the ALJ found that plaintiff's depression does not cause more than a minimal limitation in his ability to do mental work activities. Accordingly, she found that plaintiff's mental impairments are not severe. (Tr. 22-25).

The ALJ concluded that plaintiff has the RFC to perform light work, but limited to no repetitive reaching over the shoulder with the left arm, only occasional postural activities, no ladders and no hazards such as machinery and heights. (Tr. 26).

In accordance with the testimony of the vocational expert, the ALJ found that Mr. Yates is not able to perform his past work, but there are other jobs in significant numbers at the light level which he could perform. (Tr. 31).

## Analysis

Plaintiff's points are set forth in a summary fashion, with minimal analysis of the record and very little argument in support. Defendant argues that plaintiff has waived all of his points by presenting them in a skeletal fashion and failing to support them with citations to the record and to legal authority.

A summary affirmance of the Commissioner's decision would arguably be proper in these circumstances. **See,** *Ehrhart v. Secretary*, **969 F.2d 534, 537 (7th Cir. 1992)**. In the interests of completeness, this Court has undertaken a review of the administrative record, and will analyze plaintiff's arguments to the extent that they have been articulated. In so doing, of course, this Court cannot "supply the legal research and organization to flesh out a party's arguments." *Smith v. Town of Eaton*, **910 F.2d 1469, 1471 (7th Cir. 1990).**

Plaintiff first takes issue with the ALJ's findings that he did not meet or equal the requirements of a listed impairment. With a minimum of discussion, he suggests that he meets the requirements of Listing 4.05, Recurrent arrhythmias, Listing 1.02, Major dysfunction of a joint, and/or Listing 1.04, Disorders of the Spine.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet *all* of the criteria in the listing; an impairment "cannot meet the criteria of a

listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that he meets or equals a listed impairment. *Maggard v. Apfel,* **167 F.3d 376, 380 (7th Cir. 1999).**

Mr. Yates suggests that the ALJ did not "seriously explain" why he did not meet listing 4.05. The requirements of the listing are as follows:

> Recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is no prescribed treatment), and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

The introductory part of this listing explains that "We need sufficiently detailed reports of history, physical examinations, laboratory studies, and any prescribed treatment and response to allow us to assess the severity and duration of your cardiovascular impairment. A longitudinal clinical record covering a period of not less than 3 months of observations and treatment is usually necessary, unless we can make a determination or decision based on the current evidence." Subpt P, App.1., 4.00.B.1.

Under Listing 4.05, "there must be a documented association between the syncope or near syncope and the recurrent arrhythmia. The recurrent arrhythmia, not some other cardiac or non-cardiac disorder, must be established as the cause of the associated symptom. This documentation of the association between the symptoms and the arrhythmia may come from the usual diagnostic methods, including Holter monitoring (also called ambulatory electrocardiography) and tilt-table testing with a concurrent ECG." Subpt P, App.1., 4.00.F.3.c.

Here, the ALJ correctly observed that the record does not contain the required documentation of uncontrolled recurrent episodes of cardiac syncope or near syncope. See, Tr. 26. Plaintiff points to no such documentation in the record. As was discussed in the Court's

review of the record above, plaintiff has undergone stress tests and EKGs, but they have all been negative. Dr. Issa recommended that a 30-day event monitor be used to confirm whether he had atrial fibrillation, but there is no record indicting that this was ever done. Not only does plaintiff fail to cite evidence from the record, he misstates the record by saying that Dr. Issa apparently scheduled him for ablation therapy. See, Doc. 20, p. 5. In fact, Dr. Issa indicated that, *if* the monitoring confirmed atrial fibrillation, he would first recommend a trial of medication before undertaking an ablation procedure. (Tr. 651-654).

The Court notes that, in a later point, plaintiff asserts that the ALJ misrepresented Dr. Issa's records. See, Doc. 20, pp. 9-11. However, it is clear that it is plaintiff who has misunderstood Dr. Issa's treatment notes. He did not, as plaintiff suggests, "diagnose" atrial fibrillation for 10 years. Rather, he documented that *plaintiff told him* that he had been diagnosed with atrial fibrillation. Dr. Issa specifically noted that there were no tracings available to confirm this diagnosis, and also noted that EKG testing was normal. Dr. Issa recommended 30-day monitoring to confirm the presence of atrial fibrillation, which was apparently not done.

Plaintiff's arguments as to Listings 1.02 and 1.04 are similarly weak. Plaintiff suggests that he somehow meets Listing 1.02 by virtue of his cervical fusion. However, 1.02 requires not only anatomical deformity with chronic joint pain and limitation of movement; it also requires, as relevant here, involvement of the shoulder resulting in "inability to perform fine and gross movements effectively." Because there is no evidence in the record of such inability, plaintiff cannot meet the requirements of Listing 1.02.

Similarly, Listing 1.04 requires more than just a disorder of the spine. In his brief, plaintiff cites only the first paragraph of the Listing. See, Doc. 20, p. 5. He ignores the subsequent paragraphs which set forth additional requirements. Plaintiff suggests that, because

the ALJ recognized that there was evidence of nerve root compression, she erred in finding that he did not meet the listing. However, as the ALJ correctly noted, in order to meet Listing 1.04, nerve root compression must result in motor loss, sensory or reflex loss, or inability to ambulate. There is no evidence that plaintiff's nerve root compression met the required level of severity. Therefore, Plaintiff has not demonstrated that the ALJ erred in her determination.

Mr. Yates next suggests that the ALJ erred in not giving greater weight to the opinions of his treating doctor, Dr. Rivera. He argues that the ALJ should have accepted Dr. Rivera's medical source statement limiting him to less than a full range of sedentary work.

A treating physician's opinion is, of course, not automatically entitled to controlling weight. Such an opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)** states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u>

[emphasis added]

Here, the ALJ rejected Dr. Rivera's opinions as to plaintiff's RFC because his opinion was inconsistent with other evidence, including evidence of plaintiff's activities, and evidence that plaintiff improved as a result of treatment. Dr. Rivera's evaluation was done on his initial evaluation of plaintiff, and was expressly based on plaintiff's "perceived functions." (Tr. 716).

-15-

The ALJ correctly noted that Mr. Yates reported a 50% reduction in his pain after treating with Dr. Rivera for some months. In short, "the opinion of a treating physician is entitled to controlling weight only if supported by objective medical evidence." **Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010)**. Here, the very limited functional assessment offered by Dr. Rivera in September, 2007, was not supported by objective evidence and, in fact, was contradicted by that doctor's treatment records. The ALJ did not err in failing to give Dr. Rivera's opinion more weight.

In addition, to the extent that plaintiff argues that the ALJ was bound to accept his treating physician's opinion as to his RFC, he is mistaken. SSR96-8p instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, etc. SSR96-8p, at *5 (emphasis in original). Opinions of treating doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §416.927(e).

Plaintiff also suggest that Dr. Choisser's report of his consultative examination shows a totally disabled person. That is a remarkable statement, since, as the ALJ noted, Dr. Choisser found on examination that Mr. Yates had a full range of lumbar motion, limited rotation but otherwise full motion of his cervical spine, limited range of motion of the left shoulder, spasms, normal heel toe walking and negative straight leg raising. Further, the ALJ noted that this exam was done in September, 2006, and therefore predated his fusion surgery. (Tr. 20-21). Dr. Choisser's report did not come close to opining that Mr. Yates was totally disabled, and plaintiff has not demonstrated any error in the ALJ's evaluation of his opinions.

The ALJ found the state agency physician's assessment of RFC to be reasonable and supported by the record as a whole. (Tr. 29). Plaintiff suggests that this was error because Dr.

Bancks never saw the plaintiff and did not have access to all of the medical records. This argument ignores the recognized role of the state agency physician. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." **Social Security Ruling 96-6p, at 2.** The ALJ is required by **20 CFR §§ 404.1527(f) and 416.927(f)** to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, she may not ignore it either, but must consider it and explain the weight given to the opinion in her decision. *Id.* ALJ Reason did so here.

Mr. Yates also takes issue with the ALJ's determination that his mental impairments were not severe. His reasoning is that, first, Mr. Yates is psychotic, and secondly, his GAF was assessed at 50 on two occasions.

The second point is easily disposed of. Mr. Yates' GAF was assessed at 50 only one time. His GAF was consistently assessed at 60. Plaintiff baldly states, with no support, that a GAF of 50 is "definitionally disabling." Doc. 20, p. 11. He is incorrect. The law in this Circuit is clear; a GAF score "does not reflect the clinician's opinion of functional capacity," and the ALJ is not required to rely on it to assess whether a claimant is disabled. ***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)**.

The assertion that Mr. Yates is psychotic is not supported by the record. The treatment notes from Southern Illinois Psychiatry indicate an Axis I diagnosis of major depressive disorder with psychosis. Psychosis is "a loss of contact with reality, usually including false beliefs about what is taking place or who one is (delusions) and seeing or hearing things that aren't there (hallucinations)." See, www.ncbi.nlm.nih.gov/pubmedhealth /PMH0002520/, accessed on June 21, 2011. As the ALJ noted, the records from Southern Illinois Psychiatry

consistently indicated that plaintiff's state of mind was normal and he had no signs of delusions or hallucinations. There was no objective evidence in the records to substantiate any more than mild limitations of his work-related mental abilities. His cognitive skills were normal and he had only mild impairment of attention and concentration. (Tr. 23-24). The records from plaintiff's treating psychiatrist provide substantial support for the ALJ's finding that plaintiff did not have a severe mental impairment.[3]

Mr. Yates' last two points require little analysis. He suggests that the ALJ ignored the evidence of "chronic pain" in the record, and ignored the sheer volume of medical records. On the contrary, the ALJ noted that Mr. Yates made many visits to emergency rooms and to various doctors, complaining of pain. However, the ALJ also made adverse findings as to Mr. Yates' credibility, and plaintiff has not challenged those credibility findings. Mr. Yates' discredited subjective complaints of pain do not establish that the ALJ erred in denying him benefits. And, the fact that Mr. Yates often went to emergency rooms and doctors in no way demonstrates that the ALJ's decision was not supported by substantial evidence.

## **Recommendation**

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, this Court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff John G. Yates is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **July 11, 2011.**

**Submitted: June 22, 2011.**

---

[3] The transcript contains additional mental health records which post-date the ALJ's opinion. (Tr. 820-830). This evidence cannot be considered here. ***Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994)**.

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**